209 P.3d 169

**Shari SAGE, a single woman, Plaintiff/Appellant,**

v.

**BLAGG APPRAISAL COMPANY, LTD., Defendant/Appellee.**

**No. 1 CA–CV 08–0331.**

Court of Appeals of Arizona, Division 1, Department E.

April 30, 2009.

Berk & Moskowitz, P.C. by Kent S. Berk, Daphne J. Reaume, Scottsdale, Attorneys for Plaintiff/Appellant.

Bonnett, Fairbourn, Friedman & Balint, P.C. by Robert J. Spurlock, Phoenix, Attorneys for Defendant/Appellee.

### OPINION

JOHNSEN, Judge.

¶ 1 We hold in this case that an appraiser retained by a lender to appraise a home in connection with the granting of a purchase-money mortgage may be liable to the prospective buyer for failure to exercise reasonable care in performing the appraisal.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Shari Sage made an offer to purchase a Scottsdale home for $605,200. The offer was written on a form Arizona Association of Realtors "Residential Resale Real Estate ·Purchase Contract" that provided that the buyer's obligation to complete the purchase was "contingent upon an appraisal of the Premises by an appraiser acceptable to the lender for at least the sales price." The contract further provided that Sage would reimburse the cost of the appraisal at closing.

¶ 3 After her offer was accepted, on the advice of the seller's real estate agent, Sage asked her lender, Security Mortgage Company ("Security"), to retain Joseph Blagg of Blagg Appraisal Company, LTD, to perform the appraisal. In the course of performing the appraisal, Blagg spoke to Security representatives but not to Sage. When he finished the appraisal, he submitted it to Security. Sage had signed a form requesting Security to provide her with a copy of the appraisal, which she received prior to closing. The appraisal, dated September 14, 2004, recited the livable area of the home as 2,440 square feet and estimated its market value to be $620,000.

¶ 4 A year and a half after she bought her home, Sage obtained another appraisal in connection with a refinancing. That appraisal stated that the livable area of the home was 1,871 square feet, 569 fewer square feet than stated in the Blagg appraisal.[1] Sage then sued Blagg's company, alleging his appraisal negligently misrepresented the value of her home at the time of her purchase.[2] Sage alleged that if Blagg's appraisal had calculated the home's value based on the correct amount of livable space, she would have realized the home was then worth less than she had contracted to pay for it and would have exercised her right to cancel the deal.

¶ 5 Blagg moved for summary judgment, arguing he owed Sage no duty of care. Sage filed a cross-motion for partial summary judgment on the issue of duty. Citing *Kuehn v. Stanley*, 208 Ariz. 124, 91 P.3d 346 (App.2004), and *Hoffman v. Greenberg*, 159 Ariz. 377, 767 P.2d 725 (App.1988), the superior court ruled that in these circumstances an appraiser owes no duty to a homebuyer and entered summary judgment in favor of Blagg. Sage timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes section 12–2101(B) (2003).

## DISCUSSION

### A. Standard of Review.

¶ 6 Summary judgment may be granted when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c). In reviewing a grant of summary judgment, "we view the facts in the light most favorable to the party against whom judgment was entered." *Great Am. Mortgage, Inc. v. Statewide Ins. Co.*, 189 Ariz. 123, 124, 938 P.2d 1124, 1125 (App. 1997). We determine *de novo* whether there are any genuine issues of material fact and whether the superior court erred in applying the law. *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, 130, ¶ 4, 7 P.3d 136, 139 (App. 2000).

### B. Negligent Misrepresentation by a Professional in Supplying Information.

¶ 7 We deal here with the duty a professional owes to a third party in supplying information to another for use in a business transaction. The applicable provision of the Restatement (Second) of Torts (1977) ("Restatement") is section 552, which under certain circumstances imposes liability for

---

1. The later appraisal concluded the fair market value of the home as of March 31, 2006, was $700,000. The 2006 appraisal was performed during a period of rapidly rising home prices. *See Catherine Reagor, Valley Home Price Gains Again Rank First in Nation*, Ariz. Republic, May 16, 2006, at D1 ("The cost of an existing Valley home climbed 38.4 percent in the past year."). In opposing Blagg's motion for summary judg-ment, Sage averred that her home was worth $350,000 at the time of the Blagg appraisal in September 2004.

2. Sage's complaint also alleged breach of an implied contract; that claim was dismissed without opposition.

negligent representation upon "[o]ne who, in the course of his business ... supplies false information for the guidance of others in their business transactions."

¶ 8 In relevant part, Restatement § 552 provides:

(1) One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends....

*See St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 742 P.2d 808 (1987) (applying section 552 to insurer's statements to hospital); *Van Buren v. Pima Cmty. Coll. Dist. Bd.*, 113 Ariz. 85, 546 P.2d 821 (1976) (applying section 552 to employer's statement to prospective employee).

¶ 9 In *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 30, 945 P.2d 317, 341 (App.1997), this court applied Restatement § 552 to a third party's claim based on allegedly false information supplied by an accounting firm. In that case a bank sued the accounting firm for damages incurred in a business transaction it entered based on allegedly negligent financial statements prepared by the accounting firm. *Id.* at 30–31, 945 P.2d at 341–42. Another company had retained the accounting firm to prepare its financial statements; the plaintiff bank alleged it relied to its detriment on the financials when it acquired the company. *Id.* We held a duty may be created when the maker

of a statement knows the recipient "intended to supply the information for the benefit of a limited group or class of persons and [ ] the plaintiff [is] a member of that limited group or class." *Id.* at 32, 945 P.2d at 343 (citing Restatement § 552(2)(a) and cmt. h).

¶ 10 In the two cases the superior court relied on in this case, *Hoffman* and *Kuehn*, this court cited Restatement § 552 in affirming the dismissal of negligent misrepresentation claims brought by third parties against appraisers. *Hoffman* addressed the duty owed by an appraiser hired by a property owner to appraise vacant land. At the time the owner hired the appraiser, he refused to disclose to him how he intended to use the appraisal. *Hoffman*, 159 Ariz. at 378–79, 767 P.2d at 726–27. The owner later showed the appraisal to an investor who allegedly relied on it to his detriment in deciding to purchase. *Id.* at 378, 767 P.2d at 726. Citing section 552, the court held the purchaser was not among the class of persons entitled to rely on the appraisal. *Id.* at 380, 767 P.2d at 728.

¶ 11 Plaintiffs in *Kuehn* were a married couple who, like Sage, sued an appraiser retained by a lender in connection with a real property transaction.[3] Plaintiffs agreed to pay $282,000 for the property; the appraiser arrived at precisely that number as the property's value. *Kuehn*, 208 Ariz. at 126, ¶¶ 2, 3, 91 P.3d at 348. As here, the lender provided the plaintiffs with a copy of the report prior to closing. *Id.* at ¶ 3. Before they received the appraisal, however, the plaintiffs were "already contractually bound" to complete the transaction. *Id.* at 128, ¶ 13, 91 P.3d at 350. The plaintiffs alleged that after closing, they learned the property was worth only $245,000. *Id.* at 126, ¶ 3, 91 P.3d at 348.

¶ 12 Citing Restatement § 552, the court affirmed summary judgment in favor of the appraiser. The court concluded the plaintiffs could not establish they relied on the appraisal in purchasing the property, but also observed that they failed to show the appraiser owed them a duty. *Id.* at 128–29, ¶¶ 13–14, 91 P.3d at 350–51.[4] In reaching

---

3. The court's decision did not specify the nature of the real property.

4. The facts in *Kuehn* are unlike those here, *see* ¶ 14, *infra*; even so, because its conclusion with respect to Restatement § 552 was not necessary

this conclusion, the court noted that the appraisal's stated purpose was "for use by [the lender] for a mortgage finance transaction only" and that it was a "short form" appraisal intended to be "a quick estimate for lending purposes." *Id.* The court held that because the lender's use of the appraisal was not related to the plaintiffs' use of it, the appraiser did not provide the appraisal "for the guidance of" the plaintiffs as required by Restatement § 552(1). *Id.* at 129, ¶ 14, 91 P.3d at 351.

¶ 13 On appeal, Blagg relies on *Hoffman* and, to a larger extent, *Kuehn* in arguing that the superior court correctly concluded he owed no duty to Sage. Blagg points out that, as in *Kuehn*, the ostensible purpose of the appraisal he performed was "for use by the lender/client and/or there [sic] assigns for a mortgage finance transaction only." Moreover, in this case, the appraisal even went on to recite, "This report is not intended for any other use." The first page of the appraisal report identified Security as the "Lender/Client," and although Sage ultimately bore the cost of the appraisal, Blagg was paid by the seller, not by Sage.[5]

¶ 14 Important differences between the facts at issue here and those in *Kuehn* support our decision to re-examine the duty an appraiser owes to a buyer/borrower in a traditional home-purchase transaction. While the plaintiffs in *Kuehn* were contractually bound before they received the appraisal, Sage's contract expressly empowered her to cancel if the property did not appraise at the purchase price or greater. Moreover, Blagg testified that in preparing his appraisal, he reviewed a copy of Sage's purchase contract (although he denied noticing the provision that granted Sage the right to cancel). Blagg also was aware that Sage had the right to request a copy of his report from Security and knew that, if requested, Security was

obligated by law to provide Sage with a copy of the report. *See* 15 U.S.C. § 1691(e).

¶ 15 As noted, Restatement § 552 provides that a professional such as Blagg owes a duty to a third party only when the professional (1) intends to supply information for the benefit of the third party or (2) knows that the recipient of the information intends to supply the information to the third party. Restatement (Second) of Torts § 552(1), (2)(a). We agree with the superior court that Sage failed to offer facts sufficient to create a material issue that Blagg intended to supply the appraisal to her. The issue pursuant to Restatement § 552, therefore, is whether the facts support an inference that Blagg knew that Security, the recipient of the information, intended to provide the appraisal to Sage. *See id.* cmt. h ("It is enough . . . that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group.").

¶ 16 A good many courts in other jurisdictions have refused to impose a duty to third parties pursuant to Restatement § 552 in the absence of evidence that the professional actually knew that the third party would receive the information. At issue in *Pahre v. Auditor of State*, 422 N.W.2d 178 (Iowa 1988), for example, was a claim against an accountant that prepared a lender's financial statements. The court emphasized that Restatement § 552 imposes liability only when the maker of the information knows that the recipient will pass it on to another, not when it is merely foreseeable that it will do so. *Id.* at 180 ("foreseeability of harm is not the test") (citation omitted). *See Bank of New Orleans and Trust Co. v. Monco Agency Inc.*, 719 F.Supp. 1328, 1332 (E.D.La.1989) ("[s]ince section 552 specifically uses the word 'know' as opposed to 'should know' or 'reason to know,'" plaintiff must prove defendant accounting firm knew audit reports would be furnished to a third party); *Bad-*

---

to its holding, the case would not control the outcome of this appeal. The circumstances of the appraisal assignment in *Hoffman* are even more dissimilar to those of this case.

**5.** Sage asserts that several pages of exhibits to the appraisal report identify her as the "Borrower/Client," and argues from that we should conclude a question of fact existed as to whether

Blagg considered her to be his client. In his deposition, Blagg explained that the software he used mistakenly loaded Sage's name at that location on the exhibit pages. In reaching our conclusion that Blagg owed a duty to Sage, we do not rely on the language from the appraisal's exhibit pages.

*ische Corp. v. Caylor,* 257 Ga. 131, 356 S.E.2d 198, 200 (1987) (limiting duty to those whom the maker of a statement "is actually aware will rely upon" it; rejecting argument that duty is owed to "foreseeable" users of the information); *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 N.C. 200, 367 S.E.2d 609, 618 (1988) (holding in accountant case that the Restatement provision requires "that the auditor know that his client intends to supply information to another person or limited group of persons") (emphasis in original); *Webb v. Leclair,* 182 Vt. 559, 933 A.2d 177, 181, ¶ 16 (2007) (appraiser retained by lender to support extension of credit in connection with home purchase owed no duty to purchaser; because lender was under no obligation to supply appraisal to purchaser, the appraiser did not know it would do so); *First Nat'l Bank of Bluefield v. Crawford,* 182 W.Va. 107, 386 S.E.2d 310, 313 (1989) (under Restatement § 552, accountant owed duty "only to known users" of financial statements); *cf. Cooper v. Brakora & Assocs., Inc.,* 838 So.2d 679 (Fla.Dist.App. 2003) (affirming dismissal of buyer's claim against appraiser retained by lender when the purchase contract was not conditioned on an appraisal).

¶ 17 Other courts have concluded that appraisers and other professionals may owe a duty even in the absence of knowledge that the information in question was certain to be furnished to another. In *Alva v. Cloninger,* 51 N.C.App. 602, 277 S.E.2d 535, 540 (1981), for example, the court reversed a directed verdict in favor of an appraiser hired by a lender that was financing a home purchase because the record contained "evidence from which the jury could have concluded that defendant should have reasonably foreseen and expected that [buyers] would rely on the appraisal report." Among the factors the court found significant was that the defendant appraiser "should have been aware of the importance of his appraisals to borrowers and the reliance that borrowers would place thereon." *Id. See also Zanaty Realty, Inc. v. Williams,* 935 So.2d 1163, 1167 (Ala.2006) ("the key factor in determining whether a real-estate appraiser owes a duty to a buyer

of the appraised property is whether injury to the buyer was foreseeable by the appraiser"); *Bronstein v. GZA GeoEnvironmental, Inc.,* 140 N.H. 253, 665 A.2d 369, 372 (1995) (in buyer's case against environmental survey firm, test was whether it was "reasonably foreseeable" that the original recipient of the survey would furnish it to the plaintiff); *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715 S.W.2d 408, 412 (Tex. App.1986) (Restatement's "apparent attempt . . . to limit the class of third parties who may recover to those actually and specifically known by the defendant is too artificial a distinction"); *Cook Consultants, Inc. v. Larson,* 700 S.W.2d 231 (Tex.App.1985) (surveyor's duty pursuant to section 552 is owed to those "who foreseeably may be expected to rely" on it).

¶ 18 The Washington supreme court employed another approach in upholding an appraiser's duty to a buyer in *Schaaf v. Highfield,* 127 Wash.2d 17, 896 P.2d 665 (1995). At issue in that case was an appraisal prepared at the request of the Veteran's Administration in connection with a home purchase. The court emphasized that rather than expose a professional to liability for "an indeterminate amount for an indeterminate time to an indeterminate class," Restatement § 552 limits the scope of the duty owed to a "limited class" of recipients of the information. *Id.* at 669–70 (quoting *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441, 444 (1931)). Without considering whether the record contained evidence the appraiser knew the buyer would receive his report, the court concluded that the buyer's interest in the overall purchase transaction placed him within "that limited class" to whom the appraiser owed a duty of due care. *Id.* at 670. Because the V.A. had contracted for the appraisal "solely because" of the buyer's application for financing, the buyer was "the most proximal third party there will ever be" to the appraisal. *Id.* Consequently, the court explained, a real estate appraiser owes a duty "to those involved in the transaction that triggered the appraisal report, including, but not necessarily limited to, the buyer and the seller." *Id.*[6]

---

**6.** After reaching that conclusion, the court af-

firmed summary judgment in favor of the ap-

¶ 19 "As a legal matter, the issue of duty involves generalizations about categories of cases." *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 10, 150 P.3d 228, 230 (2007). Duties may arise out of categorical relationships in which the law imposes on a party an obligation to treat the other with due care. *Id.* at 145, ¶ 19, 150 P.3d at 232 (citing as examples "landowner-invitee" and "tavern owner-patron" relationships). Even in the absence of a "preexisting or direct relationship between the parties," public policy may support imposition of a duty of care. *Id.* at ¶¶ 22–23.

¶ 20 In *Gipson*, the court concluded that criminal statutes evidencing public policy provided a sufficient basis for a duty of care. *Id.* at 146, ¶ 24, 150 P.3d at 233. In this case, we likewise conclude that a sufficient basis for a duty of care is found in public policy evidenced by Restatement § 552, the realities of the loan/purchase transaction by which one typically acquires a home, and emerging industry guidelines recognizing that the buyer/borrower normally relies on the appraiser in the situation we address. Based on these authorities, we conclude that in the circumstances presented here, an appraiser owes a duty not only to the lender that contracts for the appraisal but also to the prospective borrower who intends to purchase the home.

¶ 21 We reject Blagg's argument that an appraiser owes no duty to the buyer/borrower pursuant to Restatement § 552 because the loan transaction by which the buyer/borrower acquires the funds to purchase the home is distinct from the purchase transaction. As the court recognized in *Schaaf*, the appraisal the lender orders typically is the foundation of the home purchase transaction. Although Blagg argues that, as the appraiser, he served only the mortgage/lending transaction and not the separate transaction by which Sage purchased her home, we believe that distinction is without difference. A lender in Security's position will not finance the buyer's purchase if its appraiser concludes the home is not worth the financed amount. Likewise, in many cases, as here, a form residential purchase contract empowers the buyer to cancel the contract if the appraisal falls short. Whether the purchase will be made undisputedly hinges on the appraisal; we would blink at reality to conclude otherwise.

¶ 22 Blagg argues that although an appraiser knows a lender in Security's position must furnish the appraisal to the borrower if the borrower asks, for purposes of the Restatement analysis, the appraiser does not know in any particular case whether the borrower in fact will make that request. But the Restatement does not require that the professional know for a certainty that the statement will be furnished to a third party; it requires only that the professional know that the recipient of the statement, in this case the lender, *intends* to furnish the statement to another. Restatement § 552(2)(a) ("knows that the recipient intends to supply it").[7] As Blagg acknowledges, a lender must furnish the appraisal to a buyer/borrower if asked; within the meaning of the Restatement, therefore, an appraiser knows the lender "intends" to furnish it to the buyer.[8]

¶ 23 The limited duty imposed pursuant to Restatement § 552 in the circumstances we describe adds nothing to the substantive obligation an appraiser undertakes by accepting an engagement from a lender. Pursuant to that duty, the appraiser is obligated to perform the appraisal in a non-negligent fashion; the appraiser will owe the prospective homebuyer the same standard of care. Moreover, imposition of this duty does not impair the Restatement's purpose of delimiting what

---

praiser for lack of evidence that the buyer relied on the appraisal. *Id.* at 672.

7. We recognize that in the ordinary case, foreseeability does not create a duty of care. *See Gipson*, 214 Ariz. at 144, ¶ 15, 150 P.3d at 231. We address whether the appraiser "knows" the lender intends to furnish the appraisal report to the buyer/borrower because that is the requirement of Restatement § 552(2)(a).

8. A buyer in Sage's position necessarily learns from the lender at least the bare fact of whether the appraiser's estimated value has met the lender's value requirement. If the appraiser's estimate falls short, the loan will not be made, while if the loan is made, the buyer learns at least by inference that the home has appraised for at least the required amount.

otherwise might be a boundless number of persons to whom the appraiser might owe a duty. *See Ultramares,* 174 N.E. at 444. As in *Schaaf,* we conclude that including the buyer/borrower within the scope of the duty owed by an appraiser retained by a lender does not impair the Restatement's aim of restricting those to whom a professional's potential liability extends.[9]

¶ 24 Our recognition of the duty owed by an appraiser to the buyer/borrower, moreover, is consistent with evolving industry standards that acknowledge that a buyer/borrower in fact relies on an appraisal prepared at the request of the lender. In March 2005, a few months after Blagg performed his appraisal of the home Sage was to purchase, the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage Association ("Fannie Mae") issued a revised Uniform Residential Appraisal Report for use by appraisers hired by lenders in mortgage finance transactions. *See Freddie Mac & Fannie Mae, Uniform Residential Appraisal Report (2005), available at* http://www.freddiemac.com/sell/forms/pdf/70.pdf. To be sure, consistent with the Uniform Standards of Professional Appraisal Practice ("USPAP"), the form provides that "[t]he intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction." *Id.* at 4.[10] Significantly, however, the federal form also requires appraisers to certify their understanding that the borrower and a limited class of others in the same mortgage finance transaction "may rely on this appraisal report." *Id.* at 6.[11] An explanation in a Fannie Mae publication issued November 1, 2005 drives the point home:

> The appraiser's certification [ ] clarifies that the appraiser is accountable for the quality of his or her work to those who often rely on it as part of a mortgage finance transaction. The appraiser's accountability for the quality of his or her appraisal should not be limited to the lender/client and/or intended user identified in the appraisal report.

Fannie Mae, *Single Family 2007 Selling Guide,* pt. XI, ch. 2, ¶ 207 (Nov. 1, 2005), http://www.allregs.com/efnma/.

¶ 25 Finally, adopting Blagg's contention that an appraiser retained by a lender owes no duty to the buyer/borrower would mean that a prospective homebuyer who seeks to rely on a prepurchase appraisal must contract separately with an appraiser for that purpose. In the purchase in this case, as is not uncommon, the buyer was obligated to reimburse the cost of the appraisal ordered by the lender. Even if we were to assume such an arrangement were not the general rule, we see no reason to impose on the parties to a transaction the burden of paying twice for the same information simply so that the buyer may join the lender within

---

9. With respect to conduct causing physical harm, the Proposed Third Restatement of Torts provides that a duty of reasonable care is the norm, except where public policy justifies an exception to that general rule. Restatement (Third) of Torts: Liability for Physical Harm § 7 (Proposed Final Draft No. 1, 2005); *see Gipson,* 214 Ariz. at 147, ¶¶ 34, 35, 150 P.3d at 234 (Hurwitz, J., concurring). While there are good reasons to conclude that a professional who provides information should not owe a duty of care to anyone who happens to receive the information, *see Ultramares,* 174 N.E. at 444, we see no public policy reason to exclude the buyer/borrower from the scope of the appraiser's duty in a case such as this.

10. USPAP defines "intended user" to mean "the client and any other party as identified, by name or type, as users of the appraisal ... by the appraiser on the basis of communication with the client at the time of the assignment." Ap-

praisal Standards Board, *Uniform Standards of Professional Appraisal Practice,* at 106 (Jan. 1, 2005), *available at* http://commerce.appraisalfoundation.org/detail.asp?fseq=92. USPAP further provides that a party who receives an appraisal report from an appraiser's client does not "become a party to the appraiser-client relationship." *Id.* at 107. Moreover, those who receive the report pursuant to disclosure requirements "do not become intended users of the report unless the client specifically identifies them at the time of the assignment." *Id.*

11. The required certification states in full, "The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties." *Uniform Residential Appraisal Report* at 6.

the scope of the appraiser's duty of care. Public policy and common sense compel the conclusion that when a lender to which a prospective homebuyer has applied for a loan contracts for an appraisal of the home, the appraiser the lender hires owes a duty of due care not only to the lender but also to the homebuyer.

## CONCLUSION

¶ 26 For the foregoing reasons, we hold that an appraiser retained by a lender in connection with a purchase-money mortgage transaction owes a duty of care to the borrower who is the prospective buyer of the home to be appraised. Accordingly, we reverse the judgment and remand for proceedings consistent with this opinion.

CONCURRING: LAWRENCE F. WINTHROP and PATRICIA K. NORRIS, Judges.