NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

CAMELBACK PLAZA WEST, L.L.C., *Plaintiff/Appellant*,

*v.*

CBRE, INC., *Defendant/Appellee*.

No. 1 CA-CV 16-0144
FILED 5-4-2017

---

Appeal from the Superior Court in Maricopa County
No. CV2014-008962
The Honorable Karen A. Mullins, Judge

**AFFIRMED**

---

COUNSEL

William A. Miller PLLC, Scottsdale
By William A. Miller
*Counsel for Plaintiff/Appellant*

Berk Law Group PC, Scottsdale
By Kent S. Berk, Daphne J. Reaume
*Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Judge Patricia Starr[1] delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Chief Judge Michael J. Brown joined.

---

**S T A R R**, Judge:

**¶1**        Plaintiff Camelback Plaza West, L.L.C. ("Camelback") appeals the superior court's summary judgment in favor of defendant CBRE, Inc. on Camelback's claims of negligent misrepresentation and intentional interference with business expectancy.    For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY[2]

**¶2**        In April 2011, Camelback defaulted on a loan made by Desert Schools Federal Credit Union ("Desert Schools") and secured by commercial property known as the Camelback Plaza ("Property").  In June 2012, the parties entered a settlement agreement pursuant to which Desert Schools would accept $5,989,680.24 to release its security interest in the Property, provided Camelback paid cash or refinanced by August 15, 2012 (later extended to August 29, 2012).

**¶3**        Camelback obtained a letter of interest from Commercial Financial Services LLC ("CFS Global") to refinance the loan, based on a loan-to-value ratio not to exceed 75%.  In early July 2012, CFS Global retained CBRE, a global multi-service real estate company to appraise the Property.  The written engagement agreement for the appraisal, dated and countersigned by CFS Global on July 3, 2012, was between CFS Global and CBRE.  The agreement identified the "intended user" as CFS Global and the

---

[1]      The Honorable Patricia Starr, Judge of the Arizona Superior Court, has been authorized to sit in this matter pursuant to Article VI, section 3 of the Arizona Constitution.

[2]      We view the facts and inferences drawn therefrom in the light most favorable to Camelback, the party against whom summary judgment was entered.  *See, e.g., Weitz Co. L.L.C. v. Heth*, 235 Ariz. 405, 408, ¶ 2 (2014); *Brookover v. Roberts Enters., Inc.*, 215 Ariz. 52, 55, ¶ 8 (App. 2007).

"intended use" as "internal decision making purposes."  The agreement included the following specific limitations:

> Reliance on any reports produced by CBRE under this Agreement is extended solely to [CFS Global] signing below and to any other Intended Users identified in this Agreement. Other parties or entities who obtain a copy of the report may not rely upon any opinions or conclusions contained in the report unless such party or entity has expressly been identified by CBRE as an Intended User.

No intended user, other than CFS Global, was identified in the agreement. CBRE assigned Todd Lamb to perform the appraisal.  Michael Lynch, a director with CFS Global, introduced Lamb to Joan Clancy, Camelback's manager.  Clancy explained to Lamb that Camelback was seeking take-out financing to replace the loan from Desert Schools.

¶4            On July 24, 2012, Chris Ackel, a real estate agent who worked in CBRE's commercial real estate services division, tendered to Desert Schools a letter of intent on behalf of Fenway Properties ("Fenway") offering to purchase the Property for $2 million.  Desert Schools did not accept the offer and it expired by its terms two days later.

¶5            Lamb transmitted a written Self Contained Appraisal Report prepared for CFS Global to Lynch on August 4, 2012, opining the Property had an as-is valuation of $4.15 million as of July 11, 2012.  The report defined its intended use and user as:

> The intended use and user of our report is specifically named in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to nonclient, non intended users does not extend reliance to any other party and CBRE will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety.

Lynch forwarded the appraisal to Clancy, who was surprised by the valuation because the Property had appraised at $5.23 million in October 2010; Clancy was expecting the Property to appraise at no less than $6.7 million.  Over the next few days, Lynch objected to the appraisal several times, forwarding to Lamb additional documentation and "comps" for the Property, much of which had been provided by Clancy.  On August 14,

2012, Lamb agreed to amend the valuation opinion to $4.2 million, but Lynch continued to object. Lynch advised Lamb that Clancy was "very upset" and was "pushing me to order another appraisal." Lamb twice suggested that Lynch contact two local real estate brokers for confirmation of the appraised value. On August 17, 2012, Lynch requested that Lamb review two additional comps provided by Clancy, and Lamb agreed to do so.

¶6        On August 18, 2012, Lynch told Clancy that, based on an as-is valuation of $4.15 million and a 75% loan-to-value ratio, the maximum amount Camelback potentially could borrow was $3.1 million. Camelback did not obtain funds to refinance the loan, and Desert Schools sold the Property at a trustee's sale on August 29, 2012.

¶7        Camelback then brought this action alleging that CBRE (1) negligently misrepresented the appraised value of the Property and (2) intentionally interfered with Camelback's business expectancy with CFS Global so Fenway could purchase the Property.[3]  CBRE moved for summary judgment. After full briefing and oral argument, the superior court granted the motion, concluding the negligent misrepresentation claim failed because CBRE owed Camelback no duty, Camelback could not establish reliance, and Camelback failed to show any interference based on the CBRE appraisal. The court entered a final judgment, *see* Ariz. R. Civ. P. 54(c), and Camelback timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") § 12-2101(A)(1).[4]

**DISCUSSION**

¶8        Entry of summary judgment is proper "if the moving party shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). For the factual aspect of this inquiry, summary judgment is proper "if the facts

---

[3]        Camelback also asserted a common law negligence claim, but does not challenge the superior court's decision to construe that claim as a negligent misrepresentation claim. *See Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 30 (App. 1996) (gravamen of a negligence claim against a provider of professional information is negligent misrepresentation).

[4]        We cite the current version of applicable statutes when no revisions material to this decision have since occurred.

produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990). We review *de novo* whether there are any genuine issues of material fact and whether the superior court properly applied the law. *Parkway Bank & Tr. Co. v. Zivkovic*, 232 Ariz. 286, 289, ¶ 10 (App. 2013).

## I.      Negligent Misrepresentation

**¶9**          Restatement (Second) of Torts § 552 (1977) ("Restatement") "outlines the extent of an appraiser's duty to a third party who justifiably relies on false information supplied by the professional." *Belen Loan Inv'rs, LLC v. Bradley*, 231 Ariz. 448, 453, ¶ 10 (App. 2012). It provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement § 552(1); *see also KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 333, ¶ 30 n.7 (App. 2014) (stating elements of negligent misrepresentation claim). However, an appraiser's liability under § 552(1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement § 552(2).

**¶10**          The superior court granted summary judgment on two bases: CBRE did not owe Camelback a duty of care, and there were no material disputes of fact on the element of justifiable reliance. *See Kuehn v. Stanley*, 208 Ariz. 124, 128-29, ¶¶ 12-15 (App. 2004); *Sw. Non-Profit Hous. Corp. v.*

*Nowak*, 234 Ariz. 387, 394-95, ¶¶ 27-30 (App. 2014). Because we conclude the duty issue is dispositive, we do not address justifiable reliance.

**¶11** "In applying § 552, intent to influence is a threshold issue." *Nowak*, 234 Ariz. at 392, ¶ 17 (internal quotation and citation omitted). Put simply, an appraiser owes a duty to a third party if the appraiser either (1) intended to "reach and influence" the third party or (2) knew the recipient of the appraisal so intended. Restatement § 552 cmt. h; *see also Nowak,* 234 Ariz. at 391, ¶ 12; *Belen Loan*, 231 Ariz. at 455, ¶ 16.

**¶12** "[W]hether a duty exists, is a matter of law for the court to decide." *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9 (2007). Camelback, however, argues disputed facts on the question of "intent to influence" preclude summary judgment. Camelback relies on *Diggs v. Ariz. Cardiologists, Ltd.*, 198 Ariz. 198, 200, ¶ 11 (App. 2000), in which we explained that the existence of a duty may depend on preliminary fact questions if those facts are in dispute. But in light of *Gipson*, the continued viability of *Diggs'* holding that existence of a duty may depend on preliminary questions of fact is questionable. In *Gipson*, our Supreme Court plainly stated that "[t]he issue of duty is not a factual matter; it is a legal matter to be determined before the case-specific facts are considered." 214 Ariz. at 145, ¶ 21. Moreover, for several reasons, Camelback has not shown that disputed issues of material fact undercut the superior court's finding that CBRE owed it no duty under a negligent misrepresentation theory.

**¶13** First, there is no evidence CBRE intended to influence Camelback. *See* Restatement § 552 cmt. h (rule "subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied."). Neither the assignment agreement nor the appraisal report identified Camelback as an intended user. To the contrary, both expressly prohibited reliance by third parties. *See Nowak,* 234 Ariz. at 394, ¶ 24.

**¶14** Second, even assuming Lamb could foresee (or even knew) that Lynch would forward the appraisal to Clancy, *see Belen Loan*, 231 Ariz. at 456, ¶ 20, "foreseeability alone has been deemed insufficient to create a duty on the part of the information provider," *Nowak*, 234 Ariz. at 392, ¶ 17 n.4 (citations omitted). The operative issue is whether Camelback was the "person" for whose guidance the appraisal was supplied. *See* Restatement § 552 cmt. h. In forwarding the appraisal, CFS Global could not have intended to influence Camelback because Camelback was already contractually bound by the settlement agreement with Desert Schools. *See Kuehn*, 208 Ariz. at 128-29, ¶¶ 14-15 (appraiser owed no duty to homebuyers

who were contractually bound before they received the appraisal); *Nowak*, 234 Ariz. at 392, ¶ 17 & n.4 (similar); *cf. Sage v. Blagg Appraisal Co.*, 221 Ariz. 33, 36, ¶ 14 (App. 2009) (appraiser owed a duty where contract allowed homebuyer to cancel if the property did not appraise above the purchase price); *Belen Loan*, 231 Ariz. at 451, ¶ 3 (lender who funded excessive loans based on inflated appraisals stated a claim against the appraiser). Accordingly, the superior court did not err in granting summary judgment because CBRE owed Camelback no duty.

## II.    Intentional Interference with Business Expectancy

**¶15**        Camelback argues the superior court erred in concluding that CBRE could not have interfered with a business expectancy because the Fenway offer expired a week before Lamb completed the appraisal.

**¶16**        The elements for tortious interference with business expectancy are (1) the existence of a valid business expectancy, (2) the interferer's knowledge of the relationship or expectancy, (3) the interferer's intentional interference inducing or causing a breach or termination of the expectancy, and (4) resultant damage to the party whose expectancy has been disrupted. *Dube v. Likins*, 216 Ariz. 406, 412, ¶ 14 (App. 2007). The interference must be both intentional and improper as to motive or means. *Neonatology Assoc., Ltd. v. Phx. Perinatal Assocs., Inc.*, 216 Ariz. 185, 187, ¶ 8 (App. 2007) (citing *Safeway Ins. Co. v. Guerrero*, 210 Ariz. 5, 11, ¶ 20 (2005)). "Intentional" focuses on the mental state of the actor; "improper" weighs "the social importance of the interest the defendant seeks to advance against the interest invaded." *Safeway*, 210 Ariz. at 11, ¶ 21. The issue of motive or the propriety of an action may be resolved as a matter of law when there is no reasonable inference to the contrary in the record. *Neonatology*, 216 Ariz. at 188, ¶ 9.

**¶17**        Camelback contends the evidence that Ackel was pursuing the Property on behalf of Fenway while Lamb worked on the appraisal supports an inference that CBRE was intentionally interfering with Camelback's business expectancy in selling the Property to Fenway. We agree with CBRE that this inference does not raise a material dispute of fact on interference. *See Orme Sch.*, 166 Ariz. at 311 (stating that summary judgment should not be denied on the speculation a dispute over irrelevant or immaterial facts might "blossom" into a controversy in the middle of trial). Camelback claimed that Lamb "seriously undervalued" the Property so Fenway could purchase it "for pennies on the dollar." But the Fenway offer had expired by the time Lamb provided the appraisal to Lynch. Moreover, the record does not suggest or provide any basis for a reasonable

inference that Fenway or Ackel knew of the value that later appeared in the appraisal when the Fenway offer was made and expired. *See Neonatology*, 216 Ariz. at 188, ¶ 9. On this basis, the superior court properly concluded CBRE did not interfere with Camelback's business expectancy.

**CONCLUSION**

**¶18**          For the foregoing reasons, we affirm. We award costs to CBRE, upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:  AA